Donald J. Kravet (DK-2772)
KRAVET & VOGEL, LLP
Attorneys for Defendant Gregory Kahn
1040 Avenue of the Americas, Suite 1101
New York, New York 10018
(212) 997-7634

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

THOMASLLOYD GROUP PLC,



                   Plaintiff,            Case No.

    -against-

GREGORY KAHN,

                   Defendant.
------------------------------------------------------x

## NOTICE OF REMOVAL

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

    PLEASE TAKE NOTICE that defendant Gregory Kahn hereby removes to this Court the
state court action described below.

    On February 16, 2010, an action was commenced in the Supreme Court of the State of
New York, County of New York, entitled ThomasLloyd Group PLC, Plaintiff v. Gregory Kahn,
Defendant, Index Number 102030/10.

    Defendant was served with the Summons and Complaint on February 17, 2010. This
Notice is therefore timely.

    A copy of all process, pleadings and orders in the state court action is annexed hereto as
Exhibit A.

    This action is a civil action of which this Court has original jurisdiction under 28 U.S.C.
§1332, and is one which may be removed to this Court by defendant pursuant to the provisions
of 28 U.S.C. §1441(b) in that:

    (i) it is a civil action with complete diversity between parties, none of which are citizens
of New York State, because defendant is informed and believes that plaintiff
ThomasLloyd Group PLC was as of the date of the commencement of the State Court

action, and still is, a citizen of England, having incorporated under the laws of England and having its principal place of business in Zurich, Switzerland;

(ii) defendant Gregory Kahn was as of the date of the commencement of the State Court action, and still is, a citizen and resident of the State of Connecticut, his address being 125 Saw Mill Road, Stamford, Connecticut 06903; and

(ii) the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs because plaintiff alleges in its Complaint damages in an amount not less than $1,000,000.00, and seeks punitive damages in an amount not less than $1,000,000.00.

Defendant is the only defendant that has been served a Summons and Complaint in this action.

WHEREFORE, defendant Gregory Kahn respectfully requests that this action be removed to the United States District Court for the Southern District of New York.

DATED:  New York, New York
        March 5, 2010

KRAVET & VOGEL, LLP
*Attorneys for defendant Gregory Kahn*

By:  _Donald J. Kravet (DK-2772)_

1040 Avenue of Americas, Suite 1101
New York, New York 10018
(212) 997-7634

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THOMASLLOYD GROUP PLC,

Plaintiff,

- vs -

GREGORY KAHN,

Defendant.

**SUMMONS**

Index No. 102050/2010

To the above-named Defendant:

**YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff an answer to

the complaint in this action within twenty (20) days after the service of this summons, exclusive

of the day of service, or with thirty (30) days after service is complete if this summons is not

personally delivered to you with the State of New York. In case of your failure to answer,

judgment will be taken against you by default for the relief demanded in the complaint.

The basis of the venue designated is the county within New York designated by the

parties as the exclusive forum for the judicial resolution of disputes arising under the Agreement

or relating to the employment relationship created under the Agreement..

New York, New York
February 14, 2010

Nixon Peabody LLP

By: _____
Adam Gilbert
Attorneys for Defendant
437 Madison Avenue
New York, New York 10022-7001
(212) 940-3000

12889161.1

- 2 -

**Addresses:**

Gregory Kahn
125 Saw Mill Road
Stamford, CT 06903

SUPREME COURT, STATE OF NEW YORK
COUNTY OF NEW YORK

---

THOMASLLOYD GROUP PLC,

Plaintiff,

- vs -

GREGORY KAHN,

Defendant.

---

**COMPLAINT**

Index No. _10 2630_/_2010_

---

Plaintiff ThomasLloyd Group PLC ("plaintiff" or "TLG"), by its attorneys Nixon
Peabody LLP, for its complaint against defendant, Gregory Kahn ("defendant" or "Kahn"),
alleges, to the best of its knowledge, information and belief, as follows:

## NATURE OF ACTION

1.      This is an action against Kahn for disgorgement of compensation pursuant to the
faithless servant doctrine, breach of fiduciary duty and the duty of loyalty, breach of contract,
breach of the covenant of good faith and fair dealing, unfair competition, and violation of the
Computer Fraud and Abuse Act ("CFAA"), arising from Kahn's conduct in violating both his
common law and statutory duties and the express and implied covenants within Kahn's Service
Agreement that he signed on or about August 15, 2007. Rather than using his best efforts on
behalf of TLG during a time in which he received well over $1 million in compensation, Kahn –
while purportedly working for TLG exclusively – expended time and resources downloading at
least forty seven (47) pornographic movies, working for his own business and his wife's
business, violating TLG confidences, and taking actions adverse to TLG's interests.

## THE PARTIES

2.      TLG was incorporated as DKM Holdings PLC in England on February 4, 2004. TLG subsequently changed its name to DKM Financial Services Holdings PLC (December 7, 2004), then to ThomasLloyd Holdings PLC (September 11, 2006), and to its present name on January 9, 2007.

3.      Michael Sieg is the principal shareholder of the Company. The remaining shares are owned by ThomasLloyd Investments AG.

4.      TLG's original core business was asset management. Over time it has expanded, becoming the holding company for a group of companies (the ThomasLloyd Group) that now offer investment banking, securities and asset management services to corporations, financial intermediaries, institutional clients and high-net-worth individuals. These services are offered in the U.S. (from offices based in New York), Europe (from offices based in London, Vienna, and Zurich), the Middle East (through a representative based in Dubai), and Asia (through a representative based in Singapore).

5.      Kahn is an individual who resides at 125 Saw Mill Road, Stamford, Connecticut.

6.      From August 2006 until the time of his termination from TLG on June 10, 2009, Kahn was an employee of TLG.

7.      At the time of his termination, Kahn served as Group General Counsel of TLG and as a Managing Director under a Service Agreement with TLG entered into on August 15, 2007 (the "Agreement").

## VENUE

8.    Venue is proper in New York County as it is the county within New York designated by the parties as the exclusive forum for the judicial resolution of disputes arising und the Agreement or relating to the employment relationship created under the Agreement.

## KAHN'S EMPLOYMENT WITH TLG

9.    In August 2006, TLG acquired U.S.-based Illington Fund Management LLC ("Illington"), which led to the creation of the ThomasLloyd Group in its present form.

10.    At the time of this acquisition, Kahn was employed by Illington. Kahn joined Illington on June 14, 2005 as Senior Vice President and General Counsel, having previously practiced law in New York City.

11.    Following the acquisition of Illington, Kahn entered into the Agreement, which governed his relationship with TLG. Kahn was the primary drafter of the Agreement. Under the Agreement, Kahn was to serve as Managing Director and Group General Counsel of the Company.

12.    Kahn was based in TLG's Pleasantville, New York office. He was paid an annual base salary, and was also eligible to participate in the TLG Individual Performance Bonus and the Discretionary Stock Options Bonus. In 2006, TLG paid Kahn $233,333.36 in base salary and a bonus of $50,000.00; in 2007, Kahn received $371,986.09 in base salary and a bonus of $118,750.00, in 2008, Kahn received $494,519.13 in base salary and a bonus of $235,078.00, and in 2009, pro-rated to his exit in June, Kahn received $161,124.22 in base salary and a bonus of $218,343.60.

13.    In his role, Kahn served in a position of trust and confidence and, following the departure of Douglas Brennan in June 2008, Kahn was the TLG's most senior employee with a global role in the U.S.

14.    TLG placed the utmost level of trust in Kahn, as he held a pivotal position within the Company's U.S. operations, served as the company's internal attorney and was regarded as one of the senior management team of the TLG globally.  Kahn's formal duties, as set out in his Services Agreement, included Group-wide responsibility for legal matters and legal policies and procedures; supervision of the General Counsels of the Business Groups; hiring and firing of TLG legal personnel; participating in the Board of Directors meetings and advising the Board of Directors, the Company and the TLG Companies' senior management, shareholders and TLG members on corporate governance, operational and transactional matters; responsibility for all Company-level legal documentation and related contractual matters, including inter-company financing arrangements and external proprietary investments; and working closely with the Head of Human Resources to establish employment-related policies.

*The Service Agreement*

15.    The Agreement contained several key conditions of Kahn's employment with TLG.

16.    In clause 3.1(b) of the Agreement, Kahn agreed to "faithfully and diligently perform" duties assigned to him.

17.    Kahn also agreed not to participate in other ventures or businesses which interfered or conflicted with his duties to TLG.  Clause 3.5 of the Agreement provides that:

> The Executive shall not:
>
> during the term of the Appointment, subject to clause
> 3.5(b) and clause 3.5(c) below (and save as a representative
> of the Company or with the prior written approval of the

- 4 -

> board (which approval shall not be unreasonably withheld
> or delayed)) whether directly or indirectly, paid or unpaid,
> be engaged or concerned in the conduct of, *be or become
> an employee, agent, partner, consultant or director of or
> assist or have any financial interest in, any other actual or
> prospective business or profession which is in competition
> with the business carried on by the Company or any Group
> Company or which may interfere or conflict with the
> proper performance of the Executive's obligations to the
> Company.*

18.   The parties further agreed that Kahn would be reimbursed for reasonable business

expenses incurred by him in the proper performance of his duties.  Clause 6.1 of the Agreement

provides that:

> The Company shall reimburse the Executive on a monthly basis for all
> reasonable travelling, hotel (provided that hotels at which the Company
> has a corporate discount must be used if available), entertainment, mobile
> phone-related expenses and other expenses incurred by him in the proper
> performance of his duties under this Agreement provided that the
> Executive produces to the Company evidence of payment of the expenses.

19.   Kahn further agreed not to disclose any Confidential Business Information

obtained during his employment by TLG.  Clause 6.1 of the Agreement provides that:

> In relation to any Confidential Business Information of the Company
> which the Executive has obtained by virtue of his employment, the
> Executive shall not (save as may be required by law or any competent
> regulatory authority) either during the Appointment or at any time after its
> termination: (a) disclose to any person or persons (except to those
> authorised by the Company to know the same) such Confidential Business
> Information; (b) use for his own purposes or for any purposes other than
> those of the Group such Confidential Business Information; or
> (c) through any failure to exercise all due care and diligence cause any
> unauthorised disclosure of such Confidential Business Information.

The Agreement defines Confidential Business Information as:

> all and any information (whether or not recorded in documentary form or
> on computer disk or tape) relating to the business methods,
> corporate plans, finances and research and development projects of the
> Company; details of customers or potential customers of the Company, the
> nature of customers' business operations, all confidential aspects of
> customers' business relationships with the Company; all and any trade

- 5 -

secrets, secret formulae, inventions, designs of the Company or other confidential technical information relating to the creation, production or supply of any past, present or future product or service of the Company, and other information to which the Executive knows or ought reasonably to know that the Company attaches an equivalent level of confidentiality or in respect of which it owes an obligation of confidentiality to a third party.

20.    Clause 10.1 of the Agreement permits the Company to terminate Kahn's employment if Kahn:

(a) has been determined by a court of competent jurisdiction to have committed an intentional act of gross misconduct against the Company or any Group Company which results in material damage to the Company; or

(b) has been determined by a court of competent jurisdiction to have been found to be guilty of conduct by act or omission (whether in the course of the duties hereunder or otherwise) which brings the Executive or the Company or any Group Company into serious disrepute or which causes the Company or any Group Company substantial economic harm; or...

(f) is determined by a court of competent jurisdiction to have intentionally disclosed without express Company authorisation Confidential Business Information of the Company which disclosure results in material damage to the Company...

## Kahn's Misuse of Company Property, Breach of Confidence and Conflict of Interest

21.    In or about June 10, 2009, Kahn terminated his employment with the Company, alleging that he had "good reason" to do so.

22.    In July 2009, former TLG employee Tom O'Shea informed TLG that Kahn had been encouraging O'Shea to bring a claim against TLG. Mr. O'Shea further stated that Kahn may have breached certain financial regulatory requirements during his employment as a Managing Director and General Counsel of TLG.

23.    TLG commenced an investigation into these allegations, which uncovered a number of serious breaches by Kahn of his contractual duties and, moreover, his position of trust and confidence within TLG. In relation to financial regulatory matters, TLG has, where

- 6 -

appropriate, notified the Securities and Exchange Commission. Throughout his employment, Kahn accepted over $1 million in compensation from TLG, while co-opting TLG resources to engage in his own pursuits and taking actions adverse to TLG's interests.

*Kahn's Operation of Accipiter Consulting Group While at TLG*

24.    Upon information and belief, during his employment with TLG, Kahn participated in the ownership and operating of an independent business, Accipiter Consulting Group ("Accipiter"), together with a former director and employee of TLG, Douglas Brennan (his former colleague at Illington).

25.    Kahn owned and operated Accipiter without the knowledge or consent of TLG. Furthermore, Kahn operated Accipiter from "inside" TLG, using TLG email systems to conduct Accipiter business. The e-mail "signature block" on the e-mails Kahn sent relating to Accipiter identify him as "Group General Counsel, ThomasLloyd Group plc." and includes his ThomasLloyd address and contact information.

26.    On December 4, 2007, Kahn, using his TLG email account, disclosed internal proprietary TLG loan documents to the law firm Baker & McKenzie, which appears to have been representing Accipiter in a matter. TLG had taken efforts to maintain the confidentiality of the terms of these proprietary loan documents, and Kahn, as Group General Counsel, was well-aware of these efforts and the importance of maintaining confidentiality.

27.    In disclosing the confidences of his client, TLG, Kahn violated New York Disciplinary Rule 4-101, which prohibits an attorney from revealing a confidence or secret of a client, using a confidence or secret of a client to the disadvantage of the client, or using a confidence or secret of a client for the advantage of the lawyer or of a third person.

- 7 -

28.    Upon information and belief, Kahn committed serious regulatory breaches in operating Accipiter. For example, Kahn apparently accepted commissions for business which he was not authorized to conduct, and agreed with his partner Mr. Brennan to intentionally conceal an increase in commissions charged to Accipiter clients. In doing so, Kahn used his TLG email account and signature block, which describes him as TLG's Group General Counsel. TLG has reported these transgressions to the SEC.

29.    On several occasions, Kahn also sent emails soliciting investments in potential business deals on behalf of Accipiter. On at least one occasion, Kahn solicited investments from a competitor of TLG. In doing so, Kahn used his TLG email account and signature block, which describes him as TLG's Group General Counsel.

30.    Upon information and belief, James Bowe, an Accipiter client, prior to his untimely death, was in the process of making a complaint through his custodial bank relating to a personal investment he made in Accipiter. The complaint related to a lack of information provided by Accipiter and to certain misrepresentations and omissions made by Kahn regarding the investment.

31.    Kahn communicated with Mr. Bowe via his TLG email account and during TLG business hours.

32.    Kahn also utilized members of TLG's staff for Accipiter's business. For example, Kahn used secretarial staff to assist in the filing of Accipiter's formation documents and in the wiring of funds to Accipiter's offshore bank accounts.

33.    TLG has been exposed and continues to be exposed to contingent liability as a result of Kahn's misconduct in connection with his work with Accipiter. By using his TLG title

and e-mail signature block, Kahn has created the potential for financial claims against TLG and damaged its reputation.

34.    Kahn, without TLG's consent, intentionally, knowingly, and with intent to defraud, accessed TLG's protected computer systems for his own personal benefit. Kahn thereby knowingly and recklessly caused damage by breaching his duties as a fiduciary to TLG.

35.    TLG has incurred substantial damages and/or losses, due to Kahn's unauthorized access of TLG's protected computers and unauthorized possession and impairment of TLG's electronic mail systems, including, without limitation, the costs of investigating Kahn's actions and assessing the damage they caused and the considerable payments made to Kahn while engaged in this unauthorized use. Kahn has also damaged TLG by his wrongful disclosure of proprietary business documents.

*Kahn's Business Dealings with Mr. Brennan Created
an Unwaivable Conflict of Interest*

36.    As Group General Counsel, TLG tasked Kahn with negotiating the terms and conditions of Mr. Brennan's – a director – exit from the Company in June 2008. As was the case with all legal matters which TLG entrusted to Kahn, Kahn was expected to provide representation of the highest ethical standards. At the very least, TLG expected Kahn's representation to comply with New York's Rules of Professional Conduct and/or Disciplinary Rules governing attorneys.

37.    Unbeknownst to TLG, Kahn negotiated the terms of Mr. Brennan's exit from TLG, while -- at the same time -- acting as a business partner of Mr. Brennan in their Accipiter venture. This conduct breached the trust and confidence placed in Kahn as Group General Counsel of TLG, and likely violated the New York Rules of Professional Conduct related to conflicts of interest. The separation agreement with Brennan was ultimately infected by Kahn's

- 9 -

divided loyalty, and likely resulted in terms which were favorable to Brennan and not in TLG's best interests.

38.     Kahn's simultaneous representation of TLG and his business relations with Brennan resulted in a clear conflict of interest as set forth Disciplinary Rule 5-101, which prohibits an attorney from accepting or continuing employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests.

*Kahn's Conduct of Legal Work for His Wife's Company While at TLG*

39.     Kahn used TLG staff and resources to produce substantial volumes of promotional materials for his wife's company, Sensory Kids LLC ("SK"). Kahn also appears to have prepared and negotiated several legal documents in connection with the business of SK, using the Company's Information Technology equipment and secretarial resources, and during time when he should have been working exclusively on TLG's affairs.

40.     TLG was exposed and continues to be exposed to contingent liabilities as a result of Kahn's work with SK. Kahn once again used his TLG title and signature block in providing legal and other advice to SK, thus creating potential claims against TLG.

*Kahn's Downloading and Storage of Pornographic Materials on TLG Servers*

41.     A search of TLG's IT systems show that, during his employment, Kahn downloaded from the internet at least **47 pornographic movies** totaling over 300 megabytes, which were thereafter stored on the Company's server. This behavior is completely unacceptable from anyone within the business, but particularly someone in Kahn's senior position as a Managing Director and Group General Counsel, and constitutes gross misconduct.

42.     Such use of the Company's IT system is plainly prohibited and exposes TLG to potential sex discrimination and/or harassment claims from other employees, as well as significant reputational risk.  This behavior is particularly serious given Kahn's role which, as Group General Counsel, required him to create, oversee and enforce the Company's employment policies and procedures, and demanded the highest ethical standards from him at all times.  He could have exposed other employees to this clearly inappropriate material, and undoubtedly spent considerable time engaged in this activity, which time should have been spent in furtherance of TLG business.

*Kahn's False Expense Requests*

43.     Upon information and belief, Kahn submitted false expense claims, in breach of clause 6 of the Agreement.

44.     For example, Kahn submitted an expense report for the period January 5, 2008 to October 4, 2008, which included a claim for "client entertainment" on the night of April 30,. 2008. Kahn claimed that he took Todd Greenberg of Avenue Capital to The Capital Grille restaurant.  TLG contacted Mr. Greenberg who is, in fact, a law school acquaintance of Kahn. Mr. Greenberg denied being with Kahn on the night in question, and claimed not to have seen Kahn for some time.

45.     Upon information and belief, this falsified expense claim was part of a pattern of theft from TLG by Kahn and is consistent with his misuse of the TLG resources entrusted to him.

### Termination of Kahn's Employment

46.     During the first five months of 2009, Kahn expressed his desire to move away from his position as Group General Counsel.

47.     From approximately February 2009 through April 2009, TLG repeatedly offered Kahn the opportunity to undertake a full-time commercial role in investment banking within TLG, on the same employment terms. This would have involved originating transactions and/or securing investors.

48.     In April 2009, Kahn informed TLG that he had considered this offer, but he regarded a move into investment banking as a demotion. Instead, Kahn expressed a desire for a gradual and orderly exit from the Company, during which time he wanted to explore opportunities for a return to private legal practice.

49.     On or about May 27, 2009, in a conference call between Kahn, Mr. Sieg and Anthony Coveney (Managing Director), the parties came to a mutual understanding that Kahn would become a consultant as of June 1, 2009, and Mr. Coveney and Kahn would negotiate the terms and conditions of his consultancy during the week of June 8, 2009.

50.     Despite this understanding, on June 3, 2009, Kahn informed Mr. Coveney, that, earlier that day, he had announced to his colleagues in the Pleasantville office that he was "going on strike," and that he had then left the office.

51.     During that telephone call, and again on June 4, 2009, Mr. Coveney spoke extensively with Kahn in an effort to understand and address whatever problem was causing such disruptive behavior from a senior member of the team. At the end of the two days, it was still unclear what Kahn desired.

52.     On June 10, 2009, Kahn sent an email to Messrs. Sieg and Coveney, attaching a notice purporting to terminate the Agreement (the "Termination Letter").

53.     In the Termination Letter, Kahn alleged that TLG had failed to timely pay him his monthly base salary for February, March, April and May 2009 and that he was, therefore,

- 12 -

entitled to terminate the Agreement with immediate effect and to claim compensation under clause 10.3 of the Agreement.

54.     To be sure, there had been an unintended delay in Kahn's salary payments during this period (although his 2008 bonus of $218,343.60 was paid in full on April 3, 2009). However, as a member of senior management, Kahn was well aware of the reasons for those delays. Kahn was actively involved in the decision making process which ultimately was the source of delay. In particular, Kahn has specifically agreed that the Company would pay all U.S. salaries (including his own) from the proceeds of an investment banking transaction fee which was due to be paid directly into the U.S. accounts from which U.S. salaries were normally paid. Unfortunately, there was a period of delay before those proceeds were received -- but Kahn was at all times aware of the same, having been acting as legal counsel on the deal in question.

55.     Under clause 10.2(d) of the Agreement, TLG had a period of 3 days in which to cure. Any alleged "default" was cured within 2 days such that by June 12, 2009, Kahn had received all outstanding sums said to be due to him for the period identified in the Termination Letter.

56.     Despite this, on August 4, 2009, TLG received a letter from Kahn's attorneys in England, threatening to present a winding up petition in a London, England court against TLG ("Petition") if additional sums were not paid within 3 days (*i.e.*, by close of business on Friday, August 7, 2009).

57.     On August 10, 2009, Kahn's attorneys filed the Petition against TLG in a London court. These actions are the latest in a long line of attempts by Kahn to undermine TLG and, ultimately, to extort monies from the company.

## FIRST CAUSE OF ACTION
### (Faithless Servant Doctrine)

- 13 -

58.    TLG repeats and re-alleges the allegations contained in paragraphs 1 through 57 of this Complaint as if set forth fully herein.

59.    In his role as a Managing Director and Group General Counsel of TLG, Kahn was prohibited from acting in any manner inconsistent with his position and was at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.

60.    Kahn engaged in unauthorized business dealings on TLG time and by utilizing TLG's resources, and committed violations of financial regulations in these unauthorized dealings for his own personal benefit and contrary to the best interests of TLG.

61.    Kahn utilized confidential and proprietary information he obtained exclusively through his employment with TLG for his own personal benefit and against the best interests of TLG.

62.    Kahn provided legal counsel to his wife's company and utilized TLG resources to support said Company for his own personal benefit and against the best interests of TLG.

63.    Kahn downloaded a significant amount of pornographic material to TLG servers for his own personal benefit and against the best interests of TLG.

64.    By reason of the foregoing, Kahn engaged in misconduct which rises to the level of a breach of duty of loyalty and/or good faith, and has amounted to a fraud upon TLG.

65.    TLG is entitled to an order of disgorgement of all compensation paid to Kahn during his period of faithless service, as well as any revenues earned by Accipiter and/or SK as a result of Kahn's work on their behalf. Such amount is believed to be in excess of $1,000,000.00.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duties)

66.    TLG repeats and re-alleges the allegations contained in paragraphs 1 through 57 of this Complaint as if set forth fully herein.

67. Kahn had – and continues to have – specific legal and ethical duties to refrain from acting in a manner that was contrary to the TLG's best interests.

68. Kahn engaged in unauthorized business dealings on TLG time and by utilizing TLG's resources and, upon information and belief, committed violations of financial regulations in these unauthorized dealings for his own personal benefit and against the best interests of TLG.

69. Kahn utilized confidential, trade secret and proprietary information he obtained exclusively through his employment with TLG for his own personal benefit and against the best interests of TLG.

70. Kahn provided legal counsel to his wife's company and utilized TLG resources to support said Company for his own personal benefit and against the best interests of TLG.

71. Kahn downloaded a significant amount of pornographic material to TLG servers for his own personal benefit and against the best interests of TLG.

72. By reason of the foregoing, Kahn has breached his common law fiduciary duties to TLG, and his continuing violations of these duties will cause serious and irreparable damage to TLG.

73. TLG has sustained losses and damages as a direct and proximate result of Kahn's wrongful actions described herein, in an amount to be determined at trial but believed to exceed $1,000,000.00.

74. TLG is also entitled to injunctive relief to prevent Kahn's continued threatened or actual breach of his fiduciary duties.

### THIRD CAUSE OF ACTION
#### (Breach of Contract)

75. TLG repeats and re-alleges the allegations contained in paragraphs 1 through 57 of this Complaint as if set forth fully herein.

76.    Kahn's conduct, as described above, constitutes a breach of the Agreement.

77.    Under the terms of the Agreement, Kahn had a duty to faithfully and diligently perform the duties assigned to him and not to participate in competing or conflicting ventures. Kahn engaged in competing and/or conflicting business activities for his own personal benefit using TLG email systems and during TLG working hours.

78.    Under the terms of the Agreement, Kahn had a duty to refrain from disclosing the company's Confidential Business Information. Kahn obtained and retained TLG's confidential information and breached the Agreement by using such materials to his own economic benefit.

79.    By reason of the foregoing, TLG has sustained losses and damages as a direct and proximate result of Kahn's wrongful actions described herein in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing)

80.    TLG repeats and re-alleges the allegations contained in paragraphs 1 through 57 of this Complaint as if set forth fully herein.

81.    The Agreement entered into between TLG and Kahn contained an implied covenant of good faith and fair dealing.

82.    As a result of the conduct set forth above, Kahn breached this implied covenant. TLG has sustained losses and damages as a direct and proximate result of Kahn's wrongful actions described herein in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Unfair Competition)

83.    TLG repeats and re-alleges the allegations contained in paragraphs 1 through 57 of this Complaint as if set forth fully herein.

- 16 -

84.    Kahn has engaged in conduct intended to undermine and damage the business of TLG by engaging in personal business and ventures using TLG email systems and during TLG operating hours and disclosing proprietary TLG documents in violation of Kahn's contractual obligations and the common-law.

85.    Kahn's conduct constitutes common law unfair competition .

86.    As a proximate and direct cause of Kahn's actions, TLG has sustained losses and damages in an amount to be determined at trial.


### SIXTH CAUSE OF ACTION
### (Computer Fraud and Abuse Act)

87.    TLG repeats and re-alleges the allegations contained in paragraphs 1 through 57 of this Complaint as if set forth fully herein.

88.    The computer used by Kahn, including the servers, desktop computers, laptop computers, external hard drives, "Blackberry" or other mobile/cellular devices, and thumb drives, USB drives, and "flash" drives, were at all relevant times used in interstate commerce and are protected under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e). Among other things, proprietary trade secrets and confidential information belonging to TLG is stored on, and may be accessed from, one or more of these protected computers. Access is strictly controlled via various security measures, including passwords, and all are used in or affect interstate or foreign communications or commerce.

89.    Kahn intentionally accessed the secure, protected computers of TLG or other protected computers in violation of his authorization and thereby obtained information from those protected computers in violation of 18 U.S.C. § 1030(a)(2)(C).

90.    Kahn knowingly and with the intent to defraud, accessed the secure,

protected computers of TLG or other protected computers, or caused others to access the secure, protected computers of TLG, without authorization. In furtherance of the intended fraud, Kahn obtained valuable information on the secure TLG network and computers, which have a value exceeding five thousand dollars ($5,000.00) in a one-year period, in violation of 18 U.S.C. § 1030(a)(4).

91.    Kahn intentionally accessed the protected computers of TLG and/or other protected computers, and, as a result, intentionally or recklessly caused damage and loss in violation of 18 U.S.C. § 1030(a)(5)(B)-(C).

92.    Kahn, through his actions in violation of 18 U.S.C. § 1030(a)(2), (a)(4), and (a)(5)(B)-(C), has caused damages and/or losses in excess of $5,000, in violation of 18 U.S.C. § 1030(g) and (c)(4)(A)(i)(I).

WHEREFORE, TLG demands judgment as follows:

A.    An order preliminarily and permanently enjoining and restraining Kahn from engaging in the aforementioned unlawful activities;

B.    An award ordering disgorgement of all amounts received by Kahn during his period of employment, in an amount not less than $1,000,000.00;

C.    An award of damages in an amount sufficient to compensate TLG for all damages occasioned by Kahn's wrongful conduct as described herein, in an amount not less than $1,000,000.00;

D.    An award of costs, disbursements and attorneys' fees incurred in connection with this action, in an amount not less than $500,000.00;

E.    An award of punitive damages as a result of Kahn's wanton and willful and outrageous misconduct, in an amount not less than $1,000,000.00;

- 18 -

F.    An award constituting a portion of any revenue derived by Accipiter and Sensory Kids, LLC, in amounts to be determined at trial:

G.    A declaration that Kahn materially breached the terms of the Agreement with TLG and declaring the Service Agreement terminated for cause prior to his alleged "resignation"; and

H.    The granting of such other and further relief as the Court may deem just and proper.

New York, New York
February 16, 2010

Respectfully submitted,

NIXON PEABODY LLP

By: _____
        Adam B. Gilbert
437 Madison Avenue
New York, New York 10022
(212) 940-3000

*Attorneys for Plaintiff*
*ThomasLloyd Group PLC*

- 19 -